Marquiz Law Office
Professional Corporation

3088 Via Flaminia Court
Henderson, NV 89052
Phone: (702) 263-5533
Fax: (702) 263-5532
Craig A. Marquiz, Esq.
NV Bar #7437
MarquizLaw@cox.net

Attorney for Plaintiff

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| TODD C. ENGEL, | Case No.: |
| Plaintiff, | |
| v. | **COMPLAINT** |
| | **&** |
| UNITED STATES OF AMERICA; NADIA AHMED, individually and in her Official Capacity as an Assistant United States Attorney for the U.S. DEPARTMENT OF JUSTICE; STEVEN MYHRE, individually and in his Official Capacity as an Assistant United States Attorney for the U.S. DEPARTMENT OF JUSTICE; DANIEL BOGDEN, individually and in his Official Capacity as an Assistant United States Attorney for the U.S. DEPARTMENT OF JUSTICE; DANIEL P. LOVE, individually and in his Official Capacity as Special Agent for the U.S. BUREAU OF LAND MANAGEMENT; MARK BRUNK, individually and in his Official Capacity as an Officer for the U.S. BUREAU OF LAND MANAGEMENT; RAND STOVER, individually and in his Official Capacity as an Officer for the U.S. BUREAU OF LAND MANAGEMENT; KENT KLEMAN individually and in his Official Capacity as an Officer for the U.S. Bureau of Land Management; and JOEL WILLIS, individually and in his Official Capacity as an Officer and Agent of the U.S. FEDERAL BUREAU OF INVESTIGATION; DOES 1 through 100; and ROES 1 through 100, inclusive, | **DEMAND FOR JURY TRIAL ON COUNTS ONE & TWO** |
| Defendants. | |

. . .

COMES NOW Plaintiff Todd C. Engel, by and through undersigned counsel, Craig A. Marquiz, Esq. of the Marquiz Law Office, P.C., and for his claims against Defendants the United States of America ("UNITED STATES"), Nadia Ahmed ("Ahmed"), Steven Myhre ("Myhre"), Daniel Bogden ("Bogden"), Daniel P. Love ("Love"), Mark Brunk ("Brunk"), Rand Stover (Stover"), Kent Kleman ("Kleman") and Joel Willis ("Willis"), avers and alleges as follows:

### JURISDICTION & VENUE

1.      This Court possesses original subject matter jurisdiction over Plaintiff's affirmative claims for relief pursuant to 28 U.S.C. § 1331 (federal question jurisdiction), including, without limitation, Plaintiff's:  (a) 42 U.S.C. § 1983 claims against the individually-named Defendants for their deprivation of Plaintiffs' Constitutional rights (e.g., First, Second, Fourth, Fifth, Eighth and Fourteenth Amendment rights) by persons acting under color of law; (b) an implied cause of action under *Bivens v. Six Unknown Named Agents of the Fed. Bureau of Narcotics*, 403 U.S. 388 (1971) for Defendants' violation of Plaintiff's First, Fourth, Fifth and Eighth Amendment rights; (c) 42 U.S.C. § 1988 claims for the vindication of his civil rights regarding the right to purchase, keep and bear arms; (d) 28 U.S.C. § 2202 claims for declaratory relief; (e) pendent and supplemental jurisdiction over Plaintiff's state and common law claims which arise out of a common nucleus of operative facts as their federal jurisdictional granting claims pursuant to 28 U.S.C. § 1367; and (f) exclusive jurisdiction of Plaintiff's 28 U.S.C. § 1346 Federal Tort Claims Act ("FTCA") claims against the United States due to the negligent, wrongful acts and/or omissions of the individually-named federal employees who, while acting in the course and scope of their employment with their respective federal agencies, caused acts and events to occur within this forum under circumstances where the United States, if a private person, would be liable to Plaintiff as detailed in 28 U.S.C. § 2674 and the laws of the State of Nevada where the Defendants' acts or omissions occurred.

2.      Venue of this matter is properly before this Court pursuant to 28 U.S.C. § 1391 as the underlying actions and corresponding damages occurred within this District, the United States is a named Defendant and several Defendants are officers or employees of the United States within this District.

**PARTIES**

3.      Plaintiff Todd C. Engel ("Engel") is, and at all times was, an Idaho domiciliary and citizen of the United States who was wrongfully prosecuted and convicted due to an egregious, fabricated and sham proceeding advanced by the GOVERNMENT DEFENDANTS, defined below, in the United States District Court for the District of Nevada in *United States v. Bundy et al.*, Case No. 2:16-cr-00046-GMN-PAL ("Underlying Action").[1]  Notably, in the Underlying Action, the UNITED STATES spent hundreds of millions of dollars in a multi-state effort to falsely convict Plaintiff Engel, among others, of fabricated crimes purportedly dating back to 2014 and, to that end, forced Plaintiff to wrongfully endure fifty-four (54) months of incarceration and monitoring, mostly at a sweltering federal-contractor prison in Pahrump, Nevada and at Lompoc Penitentiary in Lompoc, California.  During that time, Plaintiff Engel suffered severe emotional, physical, mental, occupational and financial distress – damages and injuries which continue to this day.

4.      Defendant Ahmed, upon information and belief is, and at all material times was, a Nevada domiciliary and citizen of the United States; employed as an Assistant United States Attorney ("AUSA") in the United States Department of Justice ("DOJ") for the District of Nevada; and who caused acts and events to occur within this forum (i.e., in her individual

---

[1]      In the Underlying Action, nineteen (19) Bundy defendants, including Plaintiff Engel were separated into three (3) distinct trial groups; namely, the "Tier 1" (the alleged "leadership" defendants); "Tier 2" (the claimed "mid-level leadership" defendants); and "Tier 3" (the alleged "gunmen") groups.  Due to prosecutorial misconduct, including, without limitation, the intentional suppression of exculpatory evidence confirming, among other things, the innocence of Plaintiff, along with the government's knowing and intentional use of fabricated evidence to secure an indictment against him, the first and only trial of the Tier 1 defendants was dismissed in January 2018.  Shortly thereafter, all charges against the Tier 2 group were dismissed based upon the United States own motion to dismiss their Superseding Indictments with prejudice.  From February 6, 2017 through April 24, 2017, however, Plaintiff Engel was forced to endure a trial as part of the GOVERNMENT DEFENDANTS Tier 3 proceeding.  As noted below, Plaintiff Engel was wrongfully convicted on two charges that were subsequently vacated by the U.S. Ninth Circuit Court of Appeals due to the egregious violation of Plaintiff's Sixth Amendment rights.  Although the Judgment of the District Court was vacated, the matter was remanded for further proceedings / re-trial.  The GOVERNMENT DEFENDANTS, however, recognizing the adverse implications associated with their dismissal of the Tier 1 and Tier 2 matters, voluntarily moved to dismiss all further proceedings against Plaintiff Engel, and on September 10, 2020, Plaintiff Engel was released from custody.

capacity as to certain acts and, as to others, in her official capacity in the scope and course of her employment with the DOJ) from which Plaintiff's claims arose.

5.      Defendant Myhre, upon information and belief is, and at all material times was, a Nevada domiciliary and citizen of the United States; employed as an AUSA by the DOJ for the District of Nevada; who, at certain times, served as the acting U.S. Attorney for the District of Nevada; and who caused acts and events to occur within this forum (i.e., in his individual capacity as to certain acts and, as to others, in his official capacity in the scope and course of his employment with the DOJ) from which Plaintiff's claims arose.

6.      Defendant Bogden, upon information and belief is, and at all material times was, a Nevada domiciliary and citizen of the United States; employed as an AUSA by the DOJ for the District of Nevada; who, at certain times, served as the acting U.S. Attorney for the District of Nevada; and who caused acts and events to occur within this forum (i.e., in his individual capacity as to certain acts and, as to others, in his official capacity in the scope and course of his employment with the DOJ) from which Plaintiff's claims arose.

7.      Defendant Willis, upon information and belief is, and at all material times was, a Nevada domiciliary and citizen of the United States; employed as an officer / agent by the FBI in this District; and who caused acts and events to occur within this forum (i.e., in his individual capacity as to certain acts and, as to others, in his official capacity in the scope and course of his employment with the FBI) from which Plaintiff's claims arose.

8.      Defendant Love, upon information and belief is, and at all material times was, a Nevada domiciliary and citizen of the United States; employed as an agent of the BLM (an agency of Defendant UNITED STATES and its DOI) in this District; who served as the Special Agent in Charge ("SAC") of the BLM's Gold Butte Cattle Impoundmount Operation in approximately April 2014; and who caused acts and events to occur within this forum (i.e., in his individual capacity as to certain acts and, as to others, in his official capacity in the scope and course of his employment with the BLM / DOI) from which Plaintiff's claims arose.

9.      Defendant Stover, upon information and belief is, and at all material times was, a Nevada domiciliary and citizen of the United States; employed as an officer of the BLM in this

District; and who caused acts and events to occur within this forum (i.e., in his individual capacity as to certain acts and, as to others, in his official capacity in the scope and course of his employment with the BLM / DOI) from which Plaintiff's claims arose.

10.     Defendant Brunk, upon information and belief is, and at all material times was, a Nevada domiciliary and citizen of the United States; employed as an officer of the BLM in this District; and who caused acts and events to occur within this forum (i.e., in his individual capacity as to certain acts and, as to others, in his official capacity in the scope and course of his employment with the BLM / DOI) from which Plaintiff's claims arose.

11.     Defendant Kleman, upon information and belief is, and at all material times was, a Nevada domiciliary and citizen of the United States; employed as an officer of the BLM in this District; who served as its Assistant Special Agent in Charge ("ASAC"); and who caused acts and events to occur within this forum (i.e., in his individual capacity as to certain acts and, as to others, in his official capacity in the scope and course of his employment with the BLM / DOI) from which Plaintiff's claims arose.

12.     Defendant UNITED STATES is the federal government and, through its various agencies (e.g., the DOJ, FBI, DOI and BLM, described more specifically below) and employees (i.e., Defendants Ahmed, Myhre, Bogden, Willis, Love, Stover, Brunk and Kleman) - each of whom, for purposes of Plaintiff's Federal Tort Claims Act ("FTCA") claims, was acting within her/his official capacity and within the scope and course of her/his employment with the applicable federal agency – caused acts and events to occur within this forum from which Plaintiff's claims arose.

A.     The DOJ is, and at all material times was, an Executive Department and agency of Defendant UNITED STATES; responsible for the enforcement of law and the administration of justice within the United States and doing business in this District; the administrator of several law enforcement agencies, including, without limitation, the FBI; and the employer of Defendants Ahmed, Myhre and Bogden.

. . .

. . .

B.     The FBI is, and at all material times was, the investigative arm of Defendant UNITED STATES and DOJ; doing business in this District; and the employer of Defendant Willis.

C.     The DOI is, and at all material times was, an Executive Department and agency of Defendant UNITED STATES; responsible for the management and conservation of federal lands and natural resources through the BLM (the employer of Defendants Love, Stover, Brunk and Kleman) with both agencies doing business in this District.

13.     Defendants Ahmed, Myhre, Bogden, Willis, Love, Stover, Brunk and Kleman shall hereinafter collectively be referred to as the "GOVERNMENT DEFENDANTS."

14.     Upon information and belief, Defendants identified as DOES 1 through 100 and ROES 1 through 100, whether individual, corporate, associate, governmental or otherwise, caused acts and events to occur within this forum from which Plaintiff's claims arose.  The true names and capacities of these parties is not currently known by Plaintiff, and once such identities become known, Plaintiff will seek leave of Court to amend their Complaint accordingly.

## STATEMENT OF THE CASE

15.     Plaintiff fully incorporates herein by reference all allegations contained in paragraphs 1 through 14 of this Complaint.

16.     In the early 1850's (many years before Nevada as an unincorporated territory of the United States was admitted to the Union on October 31, 1864), ancestors of Cliven Bundy (a Mesquite, Nevada cattle rancher) migrated to Clark County, Nevada, and ultimately secured deeds from the State of Nevada to land all along the Gold Butte region.

17.     Upon that land, the Bundy family formed the Bundy Ranch as a living testimony of their family history, work ethic, pride and patriotism - a legacy which serves as an integral part of our American history and the development of the Great Basin region throughout the Western United States.

18.     Over the generations, the Bundy family invested their blood, sweat, tears and considerable labor, materials and expense to improve the Bundy Ranch, including, without . . .

6

1   limitation, developing numerous artesian springs / aquifers on the Gold Butte mountain range,

2   and securing title from the State of Nevada to the accompanying water rights.

3       19.     Those springs, in turn, have served as a life force for the Bundy family's cattle

4   that were lawfully grazing on the Bundy Ranch and its surrounding lands.

5       20.     Upon information and belief, as part of an egregious plan to eliminate ranching

6   operations within the region, divest or otherwise acquire the private water rights held by those

7   ranchers, including, without limitation, the Bundy family, and to sell-off or otherwise lease those

8   rights for commercial development or other land-use purposes, the DOI / BLM sought to wage

9   economic and financial warfare against the ranchers by imposing restrictive grazing permits and

10  fees, and limiting the number of cattle that could graze upon those lands.

11      21.     To that end, in 1998, the UNITED STATES through the DOJ and AUSA's

12  Ahmed and Bogden initiated a civil suit against Cliven Bundy in the United States District Court

13  for the District of Nevada, Case No. 2:98-cv-00531, seeking monetary damages for his refusal to

14  obtain BLM grazing permits and pay the corresponding fees.  That action, *United States v.*

15  *Cliven Bundy*, resulted in a $1 million judgment in favor of the UNITED STATES - a majority of

16  which constituted fines, penalties and interest.

17      22.     Armed with that judgment, the GOVERNMENT DEFENDANTS conspired

18  together and orchestrated a fraudulent scheme to entice Cliven Bundy and his supporters,

19  including, without limitation, Plaintiff Engel into an armed confrontation in April 2014

20  stemming from, among other things: the rounding-up and seizure of certain Bundy Ranch cattle,

21  and staging of same in Bunkerville, Nevada; the egregious execution of other cattle from

22  helicopters circling the Bundy Ranch and surrounding Gold Butte area; and their unauthorized

23  destruction of various Bundy family spring sites.

24      23.     The round-up operation was intentionally and deliberately carried out, upon

25  information and belief, at the specific direction of Defendants Ahmed, Myhre, Bogden, Love,

26  Stover, Brunk and Kleman in a brutal, violent and aggressive manner.

27      24.     Notably, upon information and belief, BLM SAC Love and Officer Stover

28  determined that violent, aggressive, excessive and authoritarian tactics would force Cliven Bundy

and his supporters (including Plaintiff Engel) to react or otherwise respond physically, and thereby "justify" the GOVERNMENT DEFENDANTS' planned "use of force in the Cattle Impoundment Operation.

25.     To that end, a whistleblower memorandum authored by BLM Special Agent Larry Wooten in November 2017 expressly documented and memorialized Defendant Love's stated intention to violently kick Cliven Bundy in the mouth as other BLM agents arrested him and took him to the ground.

26.     The GOVERNMENT DEFENDANTS' Cattle Impoundment Operation and resulting "standoff" proved to be an absolute disaster for the GOVERNMENT DEFENDANTS; notably, hundreds of protestors, including, without limitation, Plaintiff Engel, came out to support the Bundy family, express their anger for the federal government's abuse of power, its usurpation of State's rights and the unconstitutional taking and destruction of private property in violation of law.

27.     Notably, on April 6, 2014, Plaintiff Engel, while watching FOX News (national), became concerned when he observed a news report detailing the existence of helicopters and heavily-armed federal BLM officers around a cattle-rancher's property in Mesquite, Nevada. Immediately thereafter, Plaintiff Engel began monitoring social media and other news outlets to gain additional information as to what was taking place and why.  In the course of that information-gathering process, Plaintiff Engel reviewed: (a) a video detailing Dave Bundy's arrest by federal law enforcement officers after Dave Bundy lawfully captured photographs of federal sniper teams located on a hillside near the Bundy Ranch; (b) a video detailing the throwing / body-slamming of a 60-year old woman (Margaret Houston) to the ground by federal law enforcement officers from the BLM in the same general area; (c) federal  law enforcement officers release of an attack dog and their assault upon the cattle rancher's son (Ammon Bundy), including, without limitation, their tasing of him; and (d) a news agency's interview of Cliven Bundy wherein Mr. Bundy described that the Bundy Ranch was surrounded by federal snipers.

28.     Based upon the foregoing, Plaintiff Engel was concerned that the situation brewing in Nevada would rapidly escalate to another Ruby Ridge incident and, desirous of

showing his support for the Bundy family and to hopefully de-escalate the matter, made the decision to travel from Idaho to Bunkerville, Nevada on April 10, 2014.

29.     Plaintiff Engel arrived in Bunkerville, Nevada on the morning of April 12, 2014 and, upon his arrival, learned that Cliven Bundy and others had gathered at a stage to protest the Government's taking of the Bundy Family's cattle.  After listening to Cliven Bundy, Ammon Bundy and Clark County Sheriff Doug Gillespie speak, Plaintiff Engel learned that the State of Nevada had intervened and directed the BLM to stand-down on their Cattle Impoundment Operation.  Notably, as a result, the BLM would be leaving the area, removing their assets and that the Bundy Family's cattle were going to be released.

30.     Based upon that information, the crowd that had assembled, including, without limitation, Plaintiff Engel, all traveled to the Toquop Wash to observe the release of the Bundy Family's cattle from the BLM impoundment area.  Upon his arrival at the Toquop Wash parking area, Plaintiff Engel learned from another protestor that the Government had not yet dispersed and that there were federal law enforcement officers aiming assault weapons at protestors that had gathered under the Toquop Wash bridge.  Plaintiff Engel, and dozens of other people, immediately walked to the top of the bridge and, at that time, Plaintiff observed federal officers pointing high-powered assault rifles at him and others on and underneath the bridge.

31.     Approximately thirteen (13) minutes later, Plaintiff Engel moved away from the bridge toward the Toquop Wash parking area to locate State or local law enforcement officers who might be able to render assistance.  Ultimately, Plaintiff Engel encountered Nevada Highway Patrol Sergeant Shannon Serena and Trooper Clay Madsen and asked for their assistance in de-escalating the matter.  Notably, Plaintiff Engel accompanied these two State law enforcement officers back to the Toquop Wash bridge and identified where he observed federal officers pointing the high-powered sniped and assault rifles at him and others on and under the bridge.  Sergeant Serena immediately telephoned the Las Vegas Metropolitan Police Department and spoke with a high-ranking Officer who was already on-scene.  Upon information and belief, that same LVMPD Officer approached several federal law enforcement officers and directed that . . .

1    they immediately lower their rifles and holster their weapons.  The federal officers complied and,

2    shortly thereafter, all federal officers dispersed and left the scene.

3          32.    Although Plaintiff Engel did not engage in any wrongful conduct (and, in fact,

4    was deemed by Sergeant Serena to have been helpful in de-escalating the situation according to

5    Sergeant Serena's trial testimony), Plaintiff Engel, nevertheless, was:  wrongfully arrested,

6    detained, imprisoned and in-custody for over four and one-half (4 ½) years (i.e., 54 months and 1

7    week), in federally-contracted prisons, including, without limitation, a prison in Pahrump,

8    Nevada and Lompoc Penitentiary in Lompoc, California (i.e., before being released from custody

9    based upon the UNITED STATES motion to dismiss his case based, in part, upon: (a) the Ninth

10   Circuit Court of Appeal's determination that he was wrongfully convicted on two criminal counts

11   (i.e., obstruction of justice under 18 U.S.C. § 1503; and Interstate Travel in Aid of Extortion

12   under 18 USC § 1952) in violation of his Sixth Amendment right to self-representation; and

13   (b) the judicially-determined wrongdoings, including, without limitation, prosecutorial

14   misconduct, the GOVERNMENT DEFENDANTS' knowing and intentional use of fabricated

15   evidence to wrongfully arrest, detain, convict and imprison Plaintiff, and said Defendants

16   knowing and intentional failure to disclose extensive exculpatory evidence memorializing same).

17   During that time, Plaintiff Engel was wrongfully separated from his family, friends and loved

18   ones and forced to endure the GOVERNMENT DEFENDANTS' rogue prosecution based upon

19   on fabricated charges for crimes he did not commit.  Further, prior to his arrest, Plaintiff Engel

20   was subjected to "Mandatory Security Screening" each time he sought to board a commercial

21   flight and, since that time, has been precluded from purchasing firearms based upon the

22   GOVERNMENT DEFENDANTS' designation of him as a "domestic terrorist."

23         33.    Notably, Plaintiff Engel was falsely indicted in the Underlying Action on eleven

24   (11) felony counts, including, without limitation, conspiracy, conspiracy to impede federal

25   officers, assaulting, threatening, extorting, and obstructing federal officers, and four (4) counts of

26   using firearms in crimes of violence resulting from a "standoff" with agents of the BLM and

27   other federal agencies near Bunkerville, Nevada in connection with the GOVERNMENT

28   DEFENDANTS' Cattle Impoundment Operation.

1    **Federal Employee Defendants' Individualized Conduct & Personal Liability Therefor**

2        34.    Plaintiff fully incorporates herein by this reference all allegations contained in

3    paragraphs 1 through 33 of this Complaint.

4        35.    Normally federal prosecutors, as advocates, enjoy near absolute immunity from

5    lawsuits over their conduct.  However, when, as here, prosecutors abandon the confines of their

6    offices and assume the role of an investigator, they are exposed to the same liability which

7    attaches to any officer or investigator for performing that investigative function. *See Buckley v.*

8    *Fitzsimmons*, 509 U.S. 259, 273-74 (1993).

9        36.    The conduct of Defendants Ahmed, Myhre and Bogden here presents the

10   quintessential example of prosecutors abandoning their prosecutorial role, assuming the role of

11   investigators and removing their absolute immunity veils.

12       37.    Notably, a March 27, 2014 e-mail authored by a BLM agent (whose name was

13   redacted in court documents from the Underlying Action) to Sal Lauro, BLM Director of the

14   Office of Law Enforcement & Security ("OLES"), and Amy Lueders, BLM's Nevada State

15   Director, confirmed that the U.S. Attorneys Office (led by Defendant Bogden in 2014) was

16   "attempting to direct [the] law enforcement efforts" and was actually planning and staging the

17   events well before the rogue criminal prosecution commenced.  Namely:

18           [a]s for the rest of the operational guidance, it appears the NV USA is
             *directing tactical decisions*, something I've never seen in 19 years of

19           law enforcement....[I]'m in a unique situation in which I must work with
             a prosecution agency that is attempt[ing] to *direct my enforcement efforts*.

20           (Emphasis Added).

21       38.    Further, where, as here, prosecutors knowingly obtain false statements from

22   witnesses for the purpose of prosecuting another, it is a fabrication of evidence for which

23   absolute immunity is not available. *Milstein v. Cooley*, 257 F.3d 1004, 1011 (9th Cir. 2001).

24       39.    Moreover, since Defendants Ahmed, Myhre, Bogden, Love, Brunk, Stover,

25   Kleman and Willis "knew or reasonably should have known that the action[s] [they] took within

26   [their] sphere of official responsibility would violate the constitutional rights of the

27   [PLAINTIFF], or [because they] took the action[s] with ... malicious intent[] to cause a

28   deprivation of constitutional rights or other injury," the individually-named Defendants similarly

1  abandoned any claim, right or entitlement to qualified immunity regarding their unconstitutional

2  conduct. *Harlow v. Fitzgerald*, 457 U.S. 800, 815 (1982).

3       40.     Under the direction, guidance and control of Defendants Ahmed, Myhre and

4  Bogden, Defendants Love, Stover, Brunk, Kleman and others carefully prepared and fabricated

5  evidence throughout the investigation stage of the Underlying Action, and knowingly,

6  intentionally and willfully concealed exculpatory evidence regarding Plaintiff's innocence and

7  the outrageous, unlawful and unconstitutional aspects of the GOVERNMENT DEFENDANTS'

8  conduct related thereto.

9       41.     For example, Defendants Willis, Love, Brunk, Stover and Kleman along with

10  other agents and officers of the FBI and BLM, intentionally and systematically fabricated, shaped

11  and "clarified" evidence and testimony, altered records, withheld evidence, and gave false

12  testimony so that the GOVERNMENT DEFENDANTS could falsely accuse, obtain grand jury

13  indictments against, detain, prosecute and convict Plaintiff of crimes he did not commit.

14       42.     In the days following the April 12, 2014 "standoff" and cattle release, many

15  GOVERNMENT DEFENDANT witnesses authored reports and gave interviews.  Notably,

16  Defendant Brunk reported that, on April 6, 2014, he witnessed Dave Bundy's false arrest from a

17  hilltop where Defendant Brunk "was acting as a spotter/observer for a BLM sniper."  Nearly a

18  year later, on February 24, 2015, Defendant Willis attempted to "correct" Defendant Brunk's

19  prior statement by having Defendant Brunk "clarify" that he "never acted as a spotter/observer

20  for a BLM sniper, nor did he ever tell the FBI [that] he acted as a spotter/observer for a BLM

21  sniper during his original interview."

22       43.     Upon information and belief, Defendant Willis attempted to "correct" the record

23  and his subsequent testimony to protect himself and Defendants Ahmed, Myhre and Bogden

24  from prosecution for providing or otherwise suborning contrary, perjured testimony before the

25  Grand Jury, and to assist the GOVERNMENT DEFENDANTS in furtherance of their unlawful

26  conspiracy.  Upon information and belief, Defendant Willis's clandestine attempt to "clarify" the

27  statement of an employee of another federal agency (the BLM) was performed at the direction of

28  Defendants Ahmed, Myhre and Bogden.  In this regard, Defendants Ahmed, Myhre, Bogden and

Willis each knew that Defendant Brunk's prior witness statement was true and correct and, to conceal that truth and shroud their own misconduct, said Defendants falsified evidence and withheld exculpatory evidence to ensure that the GOVERNMENT DEFENDANTS' "version of events" matched the fabricated record that Defendants Ahmed, Myhre, Bogden and Willis had presented to the Grand Jury to secure rogue indictments against Plaintiff.  Not only did Defendants Ahmed, Myhre, Bogden and Willis falsely inform the Grand Jury that the UNITED STATES did not deploy snipers in 2014, these same Defendants later drafted the indictments to wrongly accuse the Bundy defendants, including Plaintiff, of falsely alleging that there were.

44.     In furtherance of the GOVERNMENT DEFENDANTS' fabricated scheme, Defendant Love cloaked the BLM Cattle Impoundment Operation as merely an effort to enforce a 2013 civil court order obtained by Defendants Ahmed and Bogden.  In reality, however, the primary purpose behind the 2014 Cattle Impoundment Operation was to frame and entrap Cliven Bundy and other supporters, including Plaintiff Engel, to react or otherwise physically respond to the GOVERNMENT DEFENDANTS' violent, aggressive, excessive and authoritarian tactics, and, thereby, "justify" the GOVERNMENT DEFENDANTS' planned "use of force" and their fabrication of criminal charges against them.

45.     To that end, the GOVERNMENT DEFENDANTS staged a confrontation between the Bundys and BLM "contract cowboys" during a local television news interview on March 28, 2014.  Notably, Defendants Love and Stover coordinated, timed and orchestrated the arrival of the BLM-hired "contract cowboys" and their corresponding equipment to coincide with a pre-arranged television interview between Cliven Bundy and his sons with KLAS Channel 8 News at that same location (an interview, upon information and belief, that was surreptitiously arranged by Defendants Love and Stover).

46.     Defendants Love and Stover secretly filmed the encounter between the Bundys and the BLM's "contract cowboys" with the intent of provoking violence and/or hostilities between them – conduct which, in turn, would prompt law enforcement intervention and the planned arrests of Cliven Bundy and his supporters.  The Bundys and their supporters, however, did not respond to the BLM's "contract cowboys" provocation and, instead, peacefully

photographed the "contract cowboys" to memorialize the incident and the egregious attempt by the GOVERNMENT DEFENDANTS to entrap or otherwise provoke the Bundys into a violent response.

47.     Notwithstanding the foregoing, the UNITED STATES would later use video from this March 28, 2014 BLM "contract cowboy" incident to intentionally mislead a federal grand jury into issuing indictments, essentially spinning this incident as an example of the Bundys' provocation of the BLM, including their violent response to the BLM's Cattle Impoundment Operation and its "stand-off" area near the Toquop Wash and Interstate-15 in Clark County, Nevada.

48.     Moreover, during their investigative efforts in 2013 and leading up to the March and April 2014 incidents, DOJ representatives, including, without limitation, Defendants Ahmed, Myhre and Bogden, upon information and belief, knowingly, intentionally and willfully modified, revised and supplemented the operational plan proposed by Defendants Love and Stover to ensure that the final Cattle Impoundment Operation would, among other things: outrage the ranching community, especially the Bundy family and their supporters, including Plaintiff Engel; provoke a confrontation between them; and entrap the Bundy family and their supporters, including, without limitation, Plaintiff Engel, into responding with physical acts of violence that would justify the GOVERNMENT DEFENDANTS' arrest, detainment and incarceration of Cliven Bundy and other Bundy family supporters, including, without limitation, Plaintiff Engel and the other Tier 2 and Tier 3 supporters.

49.     Pursuant to that scheme, the GOVERNMENT DEFENDANTS closed to the public nearly six hundred thousand (600,000) acres of land in the Gold Butte and Overton Arm areas, and purposefully forced all those who wanted to challenge the GOVERNMENT DEFENDANTS' actions to do so at one of two small dirt parcels adjacent to highways in the Bunkerville area known as "First Amendment Zones."  Notably, these two areas, located a considerable distance away from the BLM's Cattle Impoundment Operation and orchestrated "staging area," were, upon information and belief, purposefully selected by Defendants Ahmed, Myhre and Bogden, Love, Stover and Brunk, among others, to maximize the impairment of any

14

protestor's First Amendment rights, including, without limitation, the Bundy Family members, their supporters and Plaintiff Engel, and incite those who would protest against the GOVERNMENT DEFENDANTS' rogue operation and unconstitutional conduct (e.g., the purposeful destruction of the Bundy family's spring sites/artesian wells and accompanying water rights), into a physical altercation.

50.     In particular, the GOVERNMENT DEFENDANTS' egregious plan, orchestrated by Defendants Ahmed, Myhre and Bogden, Love, Stover and Brunk, among others:  seized cattle belonging to Cliven Bundy and the Bundy Ranch; visibly transported same to the BLM's "staging area;" demonstrably shoot several other cattle from helicopters circling the Bundy Ranch and surrounding areas; and, after having destroyed several thousands of dollars worth of the Bundy family's water right improvements and artesian springs / aquifers, purposefully paraded a convoy of DOI / BLM vehicles and other construction demolition equipment before the Bundys, the Tier 2 Plaintiffs and their supporters to provoke them into resisting or otherwise defying the GOVERNMENT DEFENDANTS' efforts.

51.     In furtherance of that same scheme, the GOVERNMENT DEFENDANTS, and others at their direction and control, later brutally arrested, assaulted, beat and kicked Dave Bundy (Cliven Bundy's son), as Defendants Ahmed, Myhre, Bogden, Love, Stover and Brunk, among others, had planned.

52.     Plaintiff Engel became aware of the GOVERNMENT DEFENDANTS' egregious conduct on the nightly news from his home in Idaho and on social media outlets that had published content regarding the GOVERNMENT DEFENDANTS' violation of multiple constitutional rights of American citizens and the physical violence inflicted upon Dave Bundy.

53.     Throughout that entire investigative / pre-judicial process, Defendants Ahmed, Myhre, Bogden, Love, Stover and Brunk, among others, purposefully, intentionally and knowingly sought to infringe upon various well-known and clearly understood federal and state constitutional rights for the calculated and orchestrated purpose to entrap the Bundys and their supporters, including, without limitation, Plaintiff Engel, and instigate them into physically or . . .

15

1    violently responding to the GOVERNMENT DEFENDANTS' egregious actions and interference

2    with those rights.

3         54.    Although the GOVERNMENT DEFENDANTS collectively knew that their

4    concocted charges were false, they, nevertheless, deceptively attempted to strong-arm Plaintiff

5    Engel into accepting a plea (knowing that any such agreement could be used against all of the the

6    other named Bundy defendants in the Underlying Action).  In this regard, the GOVERNMENT

7    DEFENDANTS, at the direction of Defendants Ahmed, Myhre and Bogden, advised Plaintiff,

8    among other things, that:  a conviction against him on all counts would impose mandatory

9    minimum life sentences which would separate him from his friends, family and loved ones for

10   many years – an outcome that could be avoided if he simply pled guilty to one or more of the

11   bogus conspiracy charges and accepted a plea of 10 years in jail, rather than spending the rest of

12   his life behind bars.

13        55.    The GOVERNMENT DEFENDANTS, at the direction of Defendants Ahmed,

14   Myhre and Bogden, directed that informants be planted among Plaintiff Engel during his

15   incarceration and that other inmates housed with him surreptitiously be offered the immediate

16   release from custody if those inmates would testify falsely against Plaintiff Engel and the other

17   Bundy Defendants regarding the GOVERNMENT DEFENDANTS' concocted criminal charges.

18        56.    The GOVERNMENT DEFENDANTS, at the direction of Defendants Ahmed,

19   Myhre and Bogden, also prepared, instructed, and directed others to prepare fabricated

20   investigative documents for those inmates to sign, thus manufacturing false evidence that would

21   be used in their rogue prosecution against Plaintiff Engel in violation of law and Plaintiff's

22   constitutional and due process rights.

23   **The State of Nevada's Intervention & De-Escalation Efforts (State Action)**

24        57.    Recognizing that the unlawful and unconstitutional powder-keg lit by the

25   GOVERNMENT DEFENDANTS was rapidly escalating out of control, Nevada's former

26   Governor (Brian Sandoval), former Clark County Sheriff (Doug Gillespie) and Assistant Clark

27   County Sheriff (Joe Lombardo) intervened to de-escalate the matter.

28   . . .

58.     Notably, in the midst of increasing political pressure and public outrage over the GOVERNMENT DEFENDANTS' egregious conduct, the former Nevada Governor, Clark County Sheriff and Assistant Sheriff took control of the scene and, through Assistant Clark County Sheriff Joe Lombardo issued orders directing the BLM and GOVERNMENT DEFENDANTS to wind-down their operation and to release the Bundy family's cows from the cattle pen.

59.     Defendants Bodgen and Love, recognizing that the GOVERNMENT DEFENDANTS' unlawful and unconstitutional conduct had failed to produce the planned result, implemented those orders (i.e., the State action) and, under color of Nevada law, directed federal and state officers to ensure that "a Bundy," if not Cliven Bundy himself, would pull the pins from the cattle pens so that the DOJ could use that affirmative act to establish the GOVERNMENT DEFENDANTS' fabricated theories of criminal conspiracy, extortion, armed robbery, among other false claims, against the Bundy defendants, including, without limitation, Plaintiff Engel.

60.     In accordance with the State orders and at the direction of the GOVERNMENT DEFENDANTS, Margaret Houston, a sister of Cliven Bundy, ultimately "pulled the pin" on the cattle pen and released the cattle.  Defendants Ahmed, Myhre and Bogden, in turn, used that physical act to support the GOVERNMENT DEFENDANTS' rogue prosecution of the Bundy defendants, including, without limitation, Plaintiff Engel.

**Defendants' Longbow Productions Scam**

61.     In furtherance of the GOVERNMENT DEFENDANTS' scheme to wrongfully prosecute the Bundy defendants, including Plaintiff Engel, and to manufacture evidence in support of the fabricated claims against him, Defendants Ahmed, Myhre, Bogden and Willis concocted a scheme to deceive the Bundys and their supporters, including, without limitation, Plaintiff Engel, into making incriminating statements or confessions through Defendants' unprecedented undercover FBI operation named "Longbow Productions."

62.     Notably, Defendants Ahmed, Myhre, Bogden and Willis, among others, directed hundreds of thousands of taxpayer dollars into an operation in which masqueraded FBI undercover agents falsely posed as a film crew making a documentary of the 2014 "standoff."

17

63.     Upon information and belief, Defendants Ahmed, Myhre, Bogden and Willis directed the FBI undercover agents to entice Plaintiff Engel, along with the other to-be-named Bundy defendants, with alcohol, money and other goods and favors to exaggerate their respective involvement in the GOVERNMENT DEFENDANTS' orchestrated "standoff" or to otherwise misstate, exaggerate or falsely hype the event itself, so that the UNITED STATES could increase the likelihood of securing convictions in rogue criminal proceedings that the GOVERNMENT DEFENDANTS would ultimately initiate.

64.     To that end, Defendants Ahmed, Myhre, Bogden and Willis, among others, successfully deceived various Bundy family members and supporters into participating in the "staged" interviews – interviews in which the undercover FBI agents, at said Defendants prodding, asked leading questions, with the answers later being selectively edited and later used by the GOVERNMENT DEFENDANTS in the Underlying Action.

**Defendants' Subornation of Perjury & Falsehoods to the Grand Jury**

65.     The fact that Defendant Bogden had scripted and directed the filming of a video depicting "a Bundy" removing a pin from the cattle pen at the GOVERNMENT DEFENDANTS' Cattle Impoundment Operation became problematic for Defendants Ahmed, Myhre and Bogden when they sought to obtain a grand jury indictment against the Bundy defendants, including Plaintiff Engel, the following year.

66.     Since AUSA Bogden stepped out of his role as prosecutor and assumed the role of investigator (one who directed, supervised and led law enforcement personnel in the filming of that incident), he was a material witness thereto - one who was never cross-examined or otherwise testified regarding that unprotected, unprivileged conduct.

67.     Notably, during the October 14, 2015 Grand Jury proceedings, Defendant Myhre purposefully avoided a Grand Juror's question directed at the UNITED STATES involvement in the pin removal act and purposefully proffered evasive testimony to avert Defendant Love from disclosing the truth regarding that incident.  In particular:

**MYHRE**:     But you never received any order to release the cattle?

**LOVE**:     No sir, did not.

An unknown grand juror asked Love to clarify his statements indicating that Dave Bundy and Ryan Bundy *"did release the cattle" "but on your [Love's] authority, is that correct?"* Love responded *"No I did not give them the authority to release the cattle."* The Grand juror followed up: *"No but I'm just saying it's on your authority you had them release the cattle . . . ."*

At that point Myhre <u>interrupted the proceedings</u>, <u>stopped</u> Love from answering and began to <u>testify</u> himself by asking leading questions.

**MYHRE**:    "But your decision wasn't to release the cattle, your decision was to abandon the ICP, Incident Command Post is that correct?

**LOVE:**    That is correct and then to turn over – obviously by abandoning the cattle are left there in the pen and I was thereby leaving the cattle and then admonishing and explaining to the Bundys that should they so choose to release those cattle they would be doing so under potential violation of federal law with recourse."

**MYHRE**:    "So in essence you were not giving them permission to release the cattle? You are saying we're leaving and that if you release the cattle it's in violation of federal law."

68.    Throughout 2015 and 2016, Defendants Ahmed, Myhre, Bogden, Willis, Love, Stover and Brunk deliberately, maliciously and intentionally mislead the Grand Jury so that they could falsely obtain an indictment against Plaintiff Engel.

69.    Upon information and belief, on September 16, 2015, Defendant Ahmed knowingly, intentionally and willfully elicited false and misleading testimony from Defendant Stover before the Grand Jury regarding the BLM's threat assessments of Plaintiff Engel and the other Bundy Defendants, and their propensity for engaging in potential acts of violence. Defendants Ahmed and Stover, well-aware that the BLM assessments actually established that the Bundys and Plaintiff Engel would <u>not</u> engage in potential acts of violence, elicited and provided false testimony claiming that the Bundy's and Plaintiff Engel would, in fact, respond with potential acts of violence.

70.    At that same time, Defendants Ahmed and Stover also knowingly, intentionally and willfully elicited and provided false and misleading testimony regarding the UNITED STATES use of snipers. Despite the fact that numerous federal agents / snipers were located on hillsides around the Bundy Ranch and Cattle Impoundment Operation's "staging area" in April 2014 pursuant to the GOVERNMENT DEFENDANTS' scheme, Defendant's Ahmed and Stover egregiously claimed that the operational plan <u>did not</u> include the use of snipers, and the

1    purported use of snipers was merely a story concocted by the Bundy's and their supporters,

2    including Plaintiff Engel.

3        71.    Defendants Ahmed and Stover also materially misled the Grand Jury regarding

4    the GOVERNMENT DEFENDANTS' First Amendment Zones imposed on the Bundy family,

5    and their supporters, including, without limitation, Plaintiff Engel, in March and April 2014.

6        72.    As noted above, the GOVERNMENT DEFENDANTS closed to the public

7    nearly six hundred thousand (600,000) acres of land in the Gold Butte and Overton Arm areas

8    and, in so doing, imposed the single largest infringement on free speech in American history

9    (measured geographically).

10       73.    Hundreds of Americans, including, without limitation, Plaintiff Engel, traveled to

11   the Bunkerville, Nevada area to protest the GOVERNMENT DEFENDANTS' impairment of

12   the Bundy family's First Amendment right to free speech and the expression of their religious

13   freedoms – restrictions which were also denounced by numerous public officials who readily

14   acknowledged the unconstitutionality of same.

15       74.    Consequently, Defendants Ahmed and Stover knew that in order for the Grand

16   Jury to indict the demonstrators (persons who merely came to protest the GOVERNMENT

17   DEFENDANTS' egregious conduct, support the Bundy family and exercise their own

18   constitutionally-protected free speech rights), they had to knowingly, intentionally and willfully

19   mislead the Grand Jury regarding same.

20       75.    To that end, on September 16, 2015, Defendants Ahmed and Stover knowingly,

21   intentionally and willfully misled the Grand Jury into believing the following:

22   **AHMED:**    Did the operation plan consider having designated areas in the
              operation area <u>for people who wanted to view</u> the governments
23              activities or the impound operation itself?"

24   **STOVER:**    "It did."

25   **AHMED:**    "And were those areas actually what would come to be known as
              the First Amendment zones or First Amendment areas?"
26

27   **STOVER:**    "Correct. . . . It included those areas <u>not to dictate</u> to people where
              they could express their First Amendment rights but it allowed an
28              area that was safe for the public to go to and get them in <u>as close
              proximity as possible</u> to the closed operational area so they would

20

have chance to <u>if they wanted to view some of the gather operations</u>?"

**AHMED:** "Is this setting up of areas <u>as close as possible</u> to where the operation activities are taking place, is that something that the BLM includes regularly in its gathering operations?"

**STOVER:** "Sure. . . ."

76.     Notably, however, Defendants Ahmed and Stover knew that the First Amendment Zones:  (1) <u>were mandatory</u> (i.e., federal officers told protesters that they must go to the designated First Amendment Zones); (2) offered <u>no view whatsoever of any Cattle Impoundment Operations</u>; (3) were located <u>miles away from those operations</u>; and (4) were actually patrolled, monitored and watched over by armed government agents.

77.     Tellingly, during the first trial of the Tier 3 matter, Defendant Stover admitted on cross examination that the GOVERNMENT DEFENDANTS' First Amendment Zones "were not areas that were appropriate" for citizens to exercise their First Amendment rights.

**Defendants' Rogue Indictment**

78.     On March 2, 2016, after several months of presenting fabricated, misleading and perjured evidence and testimony to the Grand Jury, Defendants Ahmed, Myhre, Bogden, Love, Stover, Brunk and Willis obtained an indictment against Plaintiff Engel – evidence which these Defendants knew was false and directly contradicted by exculpatory evidence which said Defendants knowingly, intentionally and willfully withheld from the Grand Jury, and the Bundy defendants, including, without limitation, Plaintiff Engel, and their counsel.

79.     That same day, Defendants Ahmed, Myhre, Bogden and Willis egregiously sought the issuance of an arrest warrant for Plaintiff Engel, knowing that there was absolutely no probable cause whatsoever to support any such arrest.

80.     To that end, Defendants Ahmed, Myhre, Bogden and Willis withheld exculpatory evidence from the judicial officer that issued the warrants, and knowingly used false, fabricated and manufactured evidence to secure same.

81.     On March 3, 2016, Plaintiff Engel was unlawfully arrested and taken into custody.

82.     Shortly thereafter, the GOVERNMENT DEFENDANTS filed their indictment against him and, although the indictment measured sixty (60) pages in length and accused 19 men of 16 separate criminal counts (notably, 11 for Plaintiff Engel), the indictment was silent as to any basis or probable cause to detain, arrest or otherwise prosecute Plaintiff Engel for any of those crimes.

83.     Notably, Plaintiff Engel's actual conduct (i.e., lawfully protesting the Government's egregious actions) was deceptively described by the GOVERNMENT DEFENDANTS in their rogue indictment as threatening, assaulting and extorting federal officers, obstructing justice, and conspiring to violate federal laws or impede federal officers.

84.     Further, after the indictment was filed in the Underlying Action, Defendants Ahmed, Myhre, Bogden, Willis, Love, Stover, Brunk and Kleman conspired with one another to conceal, among other evidence, the BLM threat assessments, the GOVERNMENT DEFENDANTS' use of snipers and other exculpatory evidence from Plaintiff Engel, and all of the Bundy defendants, in the Underlying Action.

85.     The indictment also falsely claimed that the Bundy defendants in the Tier 1 proceeding "caused images of DAVE BUNDY's arrest to be broadcasted ... combining them with false, intentionally misleading and deceptive statements 'to the effect' [that the] BLM supposedly employed snipers ... used excessive force ... and arrested Bundy for exercising his First Amendment rights."

86.     During an evidentiary hearing of the Tier 1 trial, it was irrefutably established that the BLM did, in fact, employ snipers and use excessive force.

87.     Those same facts, in conjunction with the United States' intentional withholding of exculpatory evidence (*Brady* disclosures and materials) and prosecutorial misconduct prompted Chief Judge Navarro to dismiss the United States case against the Tier 1 defendants.

88.     The indictment also baldly asserted that Plaintiff Engel had used firearms in several serious crimes of violence.  At no time, however, did Plaintiff Engel ever display, use, or threaten to use a firearm, nor did he commit any crimes, let alone a crime of violence.  While it is true that Plaintiff Engel was lawfully in possession of a rifle at certain times on April 12,

22

2014, his possession thereof was in full accordance with his Second Amendment right to bear arms and, at all times, was maintained in a safe, proper and lawful manner – at no time did he display, use, or threaten to use his firearm, nor commit any crime, let alone a crime of violence.

**False Allegations Against Engel**

89.     The rogue indictment against Plaintiff Engel simply alleged that he "was a resident of Idaho who traveled to Nevada with the intent to commit the crimes set forth" therein, and accused him of being a "gunman who threatened, impeded, intimidated, interfered with, assaulted and extorted federal law enforcement officers while in the performance of their duties."

90.     At no time, however, did the GOVERNMENT DEFENDANTS possess probable cause to arrest, detain or otherwise prosecute Plaintiff Engel.

91.     Moreover, the GOVERNMENT DEFENDANTS knew that each and every material accusation set forth in the Indictment against Plaintiff Engel was inaccurate, false and intentionally misleading.

**Defendants' Wrongful Concealment of Threat Assessments & Other Misrepresentations to Federal & Magistrate Judges**

92.     In furtherance of GOVERNMENT DEFENDANTS' conspiracy to keep Plaintiff Engel falsely imprisoned (i.e., so that his release from custody could be used as a potential bargaining chip in securing a negotiated plea arrangement from one of the Tier 1 defendants, most notably, Cliven Bundy), Defendants Ahmed, Myhre and Bogden argued to the Court that the Plaintiff Engel and the other Bundy Defendants were the most dangerous, violent criminals in the history of Nevada.

93.     Defendants Ahmed, Myhre and Bogden made these egregious statements knowing, among other things, that:  (a) according to their own internal (i.e., DOJ / U.S. Attorney's Office) threat assessments, neither Plaintiff Engel nor any of the Bundy Defendants were dangerous or violent, nor did they otherwise pose any risk of being same; (b) their false statements would enable the GOVERNMENT DEFENDANTS to wrongfully detain Plaintiff Engel, preclude him from being released on bail, and deny him a speedy trial; and (c) their falsehoods would deprive Plaintiff Engel of various federal and state constitutional rights.

23

94.     Defendants Ahmed, Myhre and Bogden also materially misled the Court regarding evidence which undermined the GOVERNMENT DEFENDANTS' false portrayal of Plaintiff Engel and the lengths to which the he would purportedly go in defiance of the actions taken by the UNITED STATES.

95.     Defendants Ahmed, Myhre and Bogden, in furtherance of the GOVERNMENT DEFENDANTS' conspiracy, also knowingly, intentionally and willfully misled the Court on multiple occasions, regarding the FBI's involvement in this matter – egregiously representing that the FBI was not involved, and that their claimed involvement by the Bundy defendants, including, without limitation, Plaintiff Engel, was complete "fiction" on their part and true "urban folklore."

96.     In reality, however, Defendants Ahmed, Myhre and Bogden knew, among other things, that the FBI was actively involved and, among other things:  had engaged in an extensive surveillance and reconnaissance effort which included, without limitation, the Bundy defendants and, upon information and belief, Plaintiff Engel, their respective properties and the aforementioned First Amendment zones; conducted around-the-clock monitoring of those areas from an FBI Command Center which, upon information and belief, enabled real-time viewing of same by agency department officials located in Washington, D.C.; and had extensive exculpatory photographic and video-surveillance documentation – none of which was ever produced, disclosed or otherwise identified by the GOVERNMENT DEFENDANTS and, in fact, was knowingly, intentionally and willfully concealed by them in furtherance of their conspiracy – the existence of which was revealed for the first time during trial proceedings involving the Tier 3 group).

**The Unraveling of the GOVERNMENT DEFENDANTS' Conspiracy**

97.     In early February 2017, during the first trial of the Tier 3 defendants,[2] a BLM Case Agent assigned to assist Defendant Love and a material witness for the UNITED STATES (i.e., BLM Special Agent Larry Wooten) noticed that the defense lawyers were not cross-

---

[2]     The Tier 3 group consisted of Eric Parker, Scott Drexler, Greg Burleson, Steve Stewart, Rick Lovelein and Plaintiff Todd Engel.

examining government witnesses with expected questions arising from exculpatory evidence which Mr. Wooten had provided to the UNITED STATES and Defendants Ahmed, Myhre and Bogden.

98.     On February 16, 2017, Mr. Wooten confronted Defendants Ahmed, Myhre and Bogden regarding this issue, whether the UNITED STATES had properly disclosed the exculpatory evidence and other suspected *Brady* violations.

99.     Fearing that BLM Special Agent Wooten would reveal the nature and extent of the GOVERNMENT DEFENDANTS' conspiracy and its unlawful/unconstitutional conduct, Defendant Myhre retaliated by abruptly removing Mr. Wooten from the prosecution team and any further involvement in the case.

100.    To that end, on February 18, 2017, Defendant Myhre directed that Mr. Wooten's office be raided and ordered that all of Mr. Wooten's papers and electronic files related to the Underlying Action be seized by Mr. Wooten's immediate supervisor Defendant Kleman who knowingly, intentionally and willfully failed to record or otherwise document those materials which he removed from Mr. Wooten's office - material which, to this day, has never been identified, disclosed or otherwise produced.

101.    Upon information and belief, when Mr. Wooten learned of the unauthorized search of his office and the seizure of all of his case files from the Underlying Action, he complained of same to his superiors and, at that time, was threatened and warned by Myhre-directed BLM officers to keep his mouth shut about the prosecutorial misconduct in the case.

102.    After conferring with a DOI/BLM Ethics Official, the U.S. Office of Special Counsel ("OSC"), the BLM Office of Law Enforcement & Security Director (Salvatore Lauro) and the DOJ Office of Professional Responsibility ("OPR") – each of whom ignored Mr. Wooten's concerns and sought to distance themselves from same – Mr. Wooten submitted a whistleblower complaint to the DOJ Associate Deputy Attorney General and National Criminal Discovery Coordinator (Andrew D. Goldsmith) to expose the GOVERNMENT DEFENDANTS' egregious conduct, including, without limitation, the non-disclosure of exculpatory evidence and other *Brady* violations.

1    103.   Specifically, in a document entitled "Disclosure and Complaint Narrative in

2  Regard to Bureau of Land Management Law Enforcement Supervisory Misconduct and

3  Associated Cover-ups as well as Potential Unethical Actions, Malfeasance and Misfeasance by

4  United States Attorney's Office Prosecutors from the District of Nevada, (Las Vegas) in

5  Reference to the Cliven Bundy Investigation," (hereinafter "Whistleblower Complaint"),

6  Mr. Wooten exposed the GOVERNMENT DEFENDANTS' conspiracy and its unlawful,

7  unconstitutional conduct.

8    104.   Notably, Mr. Wooten revealed, among other things, that:

9           A.    There was a "widespread pattern of bad judgment, lack of discipline,

10  incredible bias, unprofessionalism and misconduct, as well as likely policy, ethical, and legal

11  violations among senior and supervisory staff at the BLM's Office of Law Enforcement and

12  Security."

13           B.    The "issues amongst law enforcement supervisors in our agency made a

14  mockery of our position of special trust and confidence, portrayed extreme unprofessional bias,

15  adversely affected our agency's mission and likely the trial regarding Cliven Bundy and his

16  alleged co-conspirators and ignored the letter and intent of the law."

17           C.    "The issues [he] uncovered ... also likely put [the DOI / BLM] and

18  specific law enforcement supervisors in potential legal, civil, and administrative jeopardy."

19           D.    This was "the largest and most expansive and important investigation

20  ever within the Department of Interior."

21           E.    SAC Love "specifically took on assignments that were potentially

22  questionable and damaging (such as document shredding, research, discovery email search

23  documentation and as the affiant for the Dave Bundy iPad Search Warrant) ... [Mr. Wooten felt

24  like SAC Love] wanted to steer the investigation away from misconduct discovery ..."

25           F.    "The misconduct caused considerable disruption in our workplace, was

26  discriminatory, harassing and showed clear prejudice against the defendants, their supporters

27  and Mormons."

28  . . .

G.     "Oftentimes this misconduct centered on being sexually inappropriate, profanity, appearance/body shaming and likely violated privacy and civil rights."

H.     There were "potentially captured comments in which [DOI / BLM] law enforcement officers allegedly bragged about roughing up Dave Bundy, grinding his face into the ground, and Dave Bundy having little bits of gravel stuck to his face" as a result of his unlawful arrest.

I.     "On two occasions, [Mr. Wooten] overheard [SAC Love] tell [another DOI / BLM assistant special agent in charge] that another/other BLM employee(s) and potential trial witnesses didn't properly turn in the required discovery material (likely exculpatory evidence.)"

J.     SAC Love "even instigated the unprofessional monitoring of jail calls between defendants .., without prosecutor or FBI consent, for the apparent purpose of making fun of post arrest telephone calls ...."

K.     SAC Love sought "to command the most intrusive, oppressive, large scale, and militaristic trespass cattle impound possible.  Additionally, this investigation also indicated excessive use of force, civil rights and policy violations.

L.     SAC Love was not regularly updating the U.S. Attorney's Office "on substantive and exculpatory case findings and unacceptable bias indications" and, as such, [Mr. Wooten] personally informed ... Acting United States Attorney Steven Myhre and Assistant United States Attorney (AUSA) Nadia Ahmed, as well as Federal Bureau of Investigation (FBI) Special Agent Joel Willis by telephone of these issues."

M.     For example, Mr. Wooten advised Defendant Myhre that when Plaintiff Dave Bundy was arrested "on April 6, 2014, the BLM ... the BLM SAC and others were told not to make any arrests" (i.e., they had no arrest authority) and that SAC Love made exculpatory statements that would need to be disclosed to the defense team including, without limitation, "Go out there and kick Cliven Bundy in the mouth (or teeth) and take his cattle" and SAC Love's directive to DOI / BLM officers "to get the troops fired up to go get those cows and not . . .

1  take any crap from anyone" – statements which Defendant Myhre acknowledged would need to

2  be disclosed but never were.

3           N.      On February 18, 2017, when Mr. Wooten "was removed from [his]

4  position, ... [SAC Love] conducted a search of [Mr. Wooten's] individually occupied secured

5  office and secured safe within that office.  During that search, ... [SAC Love] without

6  notification or permission seized the Cliven Bundy/Gold Butte Nevada Investigative 'hard copy'

7  Case File, notes (to include specific notes on issues [Mr. Wooten] uncovered during the 2014

8  Gold Butte Nevada Trespass Cattle Impound and 'lessons learned') and several computer hard

9  drives that contained case material, collected emails, text messages, instant messages, and other

10  information."

11          O.      Following this seizure outside of [Mr. Wooten's] presence and without

12  [his] permission, [SAC Love] didn't provide any property receipt documentation (DI-105/Form

13  9260-43) or other chain of custody documentation (reasonably needed for trial) on what was

14  seized."

15          P.      Mr. Wooten "was also aggressively questioned [by SAC Love] about who

16  [Mr. Wooten] had told about the case related issues and other severe issues uncovered in

17  reference to the case and [SAC Love]."

18          Q.      Mr. Wooten also notes that he was "convinced that [he] was removed to

19  prevent the ethical and proper further disclosure of severe misconduct, failure to correct and

20  report, and cover-ups ...." including, without limitation, "civil rights violations and excessive

21  use of force."

22          R.      To that end, Mr. Wooten identified "the loss/destruction of, or purposeful

23  non-recording of key evidentiary items (Unknown Items 1 & 2, Video/Audio, April 6, 2014,

24  April 9, 2014, April 12, 2014 - the most important and critical times in the operation)."[3]

25  . . .

26  _____

27          [3]      In a subsequent e-mail from Mr. Wooten to (now former) DOJ Office of the
    Inspector General Attorney Mark Masling (who was tasked with investigating this matter *after*
28  the Underlying Action was dismissed), Mr. Wooten noted that there was a "dumpster of shredded
    BLM documents."

Tellingly, Mr. Wooten concluded that he "believe[d] these issues would shock the conscious of the public and greatly embarrass [the BLM] if they were disclosed."

105.    By October 2017, trial of the Tier 1 Bundy defendants[4] was nearing commencement and defense lawyers in that action expressed concerns to the Court regarding missing documents and other evidence that had not been produced or otherwise disclosed by the UNITED STATES and Defendants Ahmed, Myhre and Bogden, but were known to exist.

106.    In response, Chief District Court Judge Navarro held an evidentiary hearing and, at that hearing, numerous *Brady* violations were discovered, including, without limitation, extensive exculpatory evidence regarding the Bundy Defendants, including, without limitation, Plaintiff Engel, that had been knowingly, intentionally and willfully withheld by the UNITED STATES and Defendants Ahmen, Myhre and Bogden.

107.    In this regard, as the January 8, 2018 Hearing Transcript ("Transcript") from the Tier 1 Motion to Dismiss Hearing unequivocally reveals, Chief Judge Navarro expressly held, among other things, that:

A.    "A district court may dismiss an Indictment on the ground of outrageous government conduct if the conduct amounts to [a] due process violation." Transcript at 8:18-21 (*quoting United States v. Simpson*, 813 F.2d 1462 (9th Cir. 1991)).

B.    "To violate due process, governmental conduct must be ... 'so grossly shocking and so outrageous as to violate the universal sense of justice.'" Transcript at 9:01-05 (*quoting United States v. Restrepo*, 930 F.2d 705 (1991); *United States v. Ramirez*, 710 F.2d 535 (9th Cir. 1983)).

C.    "Outrageous government conduct occurs when the actions of law enforcement officers or informants are so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction." Transcript at 9:09-16 (*quoting United States v. Archie*, 2016 WL 475234 (D.Nev. 2016), *cert* . . .

---

[4]    The Tier 1 group consisted of Cliven Bundy, his sons Ryan Bundy and Ammon Bundy, and Ryan Payne.

1  *denied*, 2019 WL 5152784 (9th Cir. 2019); *United States v. Black*, 733 F.3d 294 (9th Cir. 2013);

2  *United States v. Russell*, 411 U.S. 423 (1973)).

3          D.    "[D]ismissal under this 'extremely high' standard is appropriate only in

4  'extreme cases in which the government's conduct violates fundamental fairness.'"Transcript at

5  9:17-21 (*quoting U.S. v Pedrin*, 797 F.3d 792 (9th Cir. 2015); *United States v. Smith*, 924 F.2d

6  889 (9th Cir. 1991)).

7          E.    "So, when reviewing a claim alleging that the Indictment should be

8  dismissed because the government's conduct was outrageous, evidence is viewed in the light

9  most favorable to the government." Transcript at 9:22 to 10:01 (*citing United States v. Gurolla*,

10  333 F.3d 944 (9th Cir. 2003)).

11          F.    "The concept of outrageous government conduct focuses on the

12  government's actions." Transcript at 10:02–3 *(citing United States v. Restrepo*, 930 F.2d 705

13  (1991)).

14          G.    "Here in this case, both the prosecution and the investigative agencies are

15  equally responsible for the failure to produce *Brady* materials to the defense." Transcript at

16  10:04-06.

17          H.    The Court finds the prosecution's representations that it was unaware of

18  the materiality of the Brady evidence is grossly shocking." Transcript at 10:13-15.

19          I.    "[T]he government was well aware that theories of self-defense,

20  provocation and intimidation might become relevant if the defense could provide a sufficient

21  offer of proof to the Court.  However, the prosecution denied the defense its opportunity to

22  provide favorable evidence to support their theories as a result of the government's withholding

23  of evidence and this amounts to a *Brady* violation." Transcript at 10:22 to 11:11.

24          J.    "[T]he prosecutor has a duty to learn of favorable evidence known to

25  other government agents, including the police, if those persons were involved in the

26  investigation or prosecution of the case." Transcript at 11:07–11 (*citing Kyles v. Whitley*, 514

27  U.S. 419 (1995).

28  . . .

1          K.      "Clearly, the FBI was involved in the prosecution of this case." Transcript

2     at 11:12.

3          L.      "Based on the prosecution's failure to look for evidence outside of that

4     provided by the FBI and the FBI's failure to provide evidence that is potentially exculpatory to

5     the prosecution for discovery purposes, the Court finds that a universal sense of justice has been

6     violated." Transcript at 11:13–17.

7          M.      Alternatively, a district court may exercise its supervisory powers in three

8     different enumerated ways:  Number one, 'to remedy unconstitutional or statutory violation[s]';

9     number two, 'to protect judicial integrity by ensuring that a conviction rests on appropriate

10    considerations validly before a jury'; or number three, 'to deter future illegal conduct."

11    Transcript at 11:24 to 12:06 (quoting *United States v. Simpson*, 813 F.2d 1462 (9th Cir. 1991)).

12         N.      "In *United States vs. W.R. Grace*," 504 F.3d 745 (9th Cir. 2007) "the

13    Ninth Circuit clarified that the exercise of the Court's inherent powers is not limited to these

14    three grounds enumerated in *Simpson* ...." Transcript at 11:24 to 12:07-10.

15         O.      "'Dismissal is appropriate when the investigatory or prosecutorial process

16    has violated a federal Constitution or statutory right and no lesser remedial action is available.'"

17    Transcript at 12:11-14 (*quoting U.S. v. Barrera-Moreno*, 951 F.2d 1089 (9th Cir. 1991)).

18         P.      "The Ninth Circuit has recognized that exercise of a supervisory power is

19    an appropriate means of policing ethical misconduct by prosecutors." Transcript at 11:15-18

20    (*citing U.S. v. Lopez*, 4 F.3d 1455 (9th Cir. 1993)).

21         Q.      "So 'dismissal under the Court's supervisory powers for prosecutorial

22    misconduct requires both: 'Number one, flagrant misbehavior, and number two, substantial

23    prejudice.'" Transcript at 12:19-23 (*quoting United States v. Kearns*, 5 F.3d 1251 (9th Cir.

24    1993)).

25         R.      "Neither accidental nor mere negligent governmental conduct is

26    sufficient.  The idea of prejudice entails that the government's conduct had at least some impact

27    on the verdict and thus rounded to the defendant's prejudice." Transcript at 12:24 to 13:02.

28    . . .

1          S.     "In Order for the Court to dismiss an Indictment under the supervisory

2 powers, the Court must find that there has been flagrant prosecutorial misconduct, substantial

3 prejudice to the defendants, and that no lesser remedial action is available." Transcript at 13:03-

4 06.

5          T.     "So the Court looks to *Chapman*, *U.S. v. Chapman*." [524 F.3d 1073 (9th

6 Cir. 2008)] ... The district court in *Chapman* found that the 'Assistant U.S. Attorney acted

7 flagrantly, willfully and in bad faith' and that he had made 'affirmative misrepresentations to the

8 Court,' and that the defendants would be prejudiced by a new trial and that no lesser standard

9 would adequately remedy the harm done after reviewing the totality of the proceedings before

10 it." Transcript at 14:8, 14:12-18.

11          U.     "The Ninth Circuit held that the *Chapman* court did not abuse its

12 discretion by dismissing the Indictment pursuant to its supervisory powers." Transcript at 14:10-

13 21.

14          V.     "'The prosecutor has a 'sworn duty' to assure that the defendant has a fair

15 and impartial trial.  His interest in a particular case is not necessarily to win, but to do justice.'"

16 Transcript at 15:14-17 (*quoting U.S. v. Chapman*." 524 F.3d 1073 (9th Cir. 2008)).

17          W.     "[T]he fact that the prosecution failed to look beyond the files provided

18 by the FBI is not mere negligence; it is a reckless disregard for its Constitution[al] obligations to

19 learn and seek out favorable evidence.  The prosecution's reliance on the FBI to provide the

20 required information *amounted to an intentional abdication of its responsibility*." Transcript at

21 16:11-16 (Emphasis Added).

22          X.     "Thus, the Court does find that there has been flagrant prosecutorial

23 misconduct in this case ...." Transcript at 19:09-10.[5]

24 . . .

25

26      [5]     With regard to the prejudice resulting from the government's recent production of
BLM Officer Wooten's Whistleblower Complaint, Judge Navarro was troubled by his "abrupt

27 removal ... in February 2017, allegedly by the prosecution because he complained of Special
Agent in Charge Dan Love's misconduct, the investigating law enforcement officer's bias, the

28 government's bias, and the failure to disclose exculpatory evidence." Transcript at 19:23 to
20:05.

1       Y.      "The Court is troubled by the prosecution's failure to look beyond the

2  FBI file that was provided and construes the Brady violations in concert as a reckless disregard

3  of its discovery obligations.  The government's recklessness and the prejudice the defendants

4  will suffer as a result of a retrial warrant the extreme measure of dismissing the Indictment

5  because no lesser sanction would adequately ... deter future investigatory and prosecutorial

6  misconduct." Transcript at 20:14-21.

7       Z.      "[The government's] conduct has caused the integrity of a future trial and

8  any resulting conviction to be even more questionable.  Both the defense and the community

9  possess the right to expect a fair process with a reliable conclusion.  Therefore, it is the Court's

10  position that none of the alternative sanctions available are as certain to impress the government

11  with the Court's resoluteness in holding prosecutors and their investigative agencies to the

12  ethical standards which regulate the legal profession as a whole." Transcript at 20:23 to 21:07.

13       AA.      "***The Court finds that the government's conduct in this case was indeed***

14  ***outrageous, amounting to a due process violation***, and that a new trial is not an adequate

15  sanction for this due process violation." Transcript at 21:08-11 (Emphasis Added).

16       BB.      "Even if the government's conduct did not rise to the level of a due

17  process violation, the Court would nonetheless dismiss under its supervisory powers because

18  there has been flagrant misconduct, substantial prejudice, and no lesser remedy is sufficient ...

19  Number one, to properly remedy the constitutional violation; number two, to protect judicial

20  integrity by ensuring that a conviction rests only on appropriate considerations validly before a

21  jury; and number three, to deter future illegal conduct." Transcript at 21:12-16, 21:20-24.

22       108.      On the heels of the GOVERNMENT DEFENDANTS' conspiracy being exposed

23  and the lead case of the consolidated matter being dismissed, the UNITED STATES, on

24  February 7, 2018 voluntarily moved to dismiss, with prejudice, their fabricated criminal charges

25  against the Tier 2 Defendants.

26       109.      Plaintiff Engel subsequently appealed his conviction, claiming, among other

27  things, that because his Sixth Amendment rights were violated, his conviction was improper as a

28  matter of law.  On August 6, 2020, the Ninth Circuit Court of Appeals agreed, holding that his

1  Sixth Amendment right to self-representation had been violated and, as a result, vacated his

2  conviction and remanded the matter for a new trial.

3        110.    The GOVERNMENT DEFENDANTS, in light of their flagrant prosecutorial

4  misconduct, their reckless disregard for their Constitutional obligations and numerous *Brady*

5  violations, moved to dismiss the Government's claims against Plaintiff Engel on September 8,

6  2020.  The District Court granted the GOVERNMENT DEFENDANTS' Unopposed Motion to

7  Dismiss that same day and/on September 10, 2020, Plaintiff Engel was released from custody.

8        111.    Notably, the GOVERNMENT DEFENDANTS' fabricated charges against

9  Plaintiff Engel directly, proximately and foreseeably caused, among other things: (a) the false

10  arrest of Plaintiff; (b) the wrongful denial of bail; (c) the unlawful detainment, imprisonment

11  and monitoring of Plaintiff Engel; (d) the egregious separation of Plaintiff Engel from his

12  family, friends and loved ones; (e) ongoing stress and mental, physical and emotional anguish

13  which Plaintiff Engel continues to experience; (f) the inability for Plaintiff Engel to freely

14  practice his faith and attend weekly worship services / other church events; (g) financial,

15  occupational and reputational harm as a result of the GOVERNMENT DEFENDANTS'

16  egregious branding and characterization of Plaintiff in the media as a "domestic terrorist;"

17  (h) the loss of gainful employment, including, without limitation, future impairment for

18  Plaintiff's chosen profession; (I) harassment and embarrassment resulting from the

19  GOVERNMENT DEFENDANTS' placement and continued maintenance of him on the

20  mandatory screening processes before being allowed to fly which results in improper

21  detainment, interrogation, delays and other travel restrictions when he attempts to fly

22  commercially; and (j) interference with Plaintiff Engel's right to lawfully acquire and bear arms

23  due to the GOVERNMENT DEFENDANTS' placement of Plaintiff on secret lists which

24  disqualifies and precludes him from purchasing firearms.

25  **The GOVERNMENT DEFENDANTS' Constitutional & Statutory Violations**

26        112.    Plaintiff fully incorporates herein by this reference all allegations contained in

27  paragraphs 1 through 111 of this Complaint.

28  . . .

113.    As a direct, proximate and foreseeable cause of the GOVERNMENT

DEFENDANTS' conspiracy (one that involved multiple egregious acts performed by the

individually-named Defendants in their official capacity; that is, within the scope and course of

their employment of their respective federal agencies, and performed in furtherance of that

conspiracy), along with other independent, unprivileged acts performed by Defendants Ahmed,

Myhre, Bogden, Love, Stover, Brunk, Kleman and Willis in their individual capacity and for

which said Defendants are personally liable, Plaintiff Engel's rights were knowingly,

intentionally and willfully violated, infringed and impaired by Defendants, including, without

limitation:

A.    Plaintiff's right to assemble, exercise free speech and lawfully protest

against the UNITED STATES egregious conduct and its wrongful curtailment of his rights by

the GOVERNMENT DEFENDANTS in contravention of the First Amendment to the United

States Constitution; Article 1, Sections 1 (Inalienable Rights), 9 (Liberty of Speech) and 10

(Right to Assemble & Petition) of the Nevada Constitution; and Nevada Revised Statute

("NRS") 41.637's protection of good faith communications in furtherance of Plaintiff's right to

petition or the right to free speech in direct connection with an issue of public concern,

including any "[c]ommunication made in direct connection with an issue of public interest in a

place open to the public or in a public forum."

B.    Plaintiff's right to lawfully purchase, keep and bear arms as provided for

in the Second Amendment to the United States Constitution; Article 1, Section 11 (Right to

Keep & Bear Arms; Civil Power Supreme) of the Nevada Constitution; and NRS 244.364 which

vests control over the regulation of, and policies concerning, firearms, firearm accessories and

ammunition with the Nevada State Legislature, including, without limitation, the regulation of

transfers, sales and purchases of same;

C.    The GOVERNMENT DEFENDANTS' fabricated indictment, unlawful

arrest, rogue detainment, preclusion of bail, false imprisonment and malicious prosecution

(i.e., without probable cause or due process of law) deprived Plaintiff of his life, liberty and

property rights, and constituted cruel and unusual punishment in contravention of the Fourth,

Fifth and Eighth Amendments to the United States Constitution; Article 1, Section 1 (Inalienable Rights), Section 6 (Excessive Bail & Fines), Section 8 (Rights of Accused in Criminal Prosecutions) and Section 18 (Unreasonable Seizure & Search; Issuance of Warrants) of the Nevada Constitution; NRS 199.310 (Malicious Prosecution) and NRS 200.460 (False Imprisonment).

D.      The GOVERNMENT DEFENDANTS' abhorrent and outrageous conduct – conduct which irrefutably shocks the conscious – egregiously deprived Plaintiff of his life, liberty and property rights in contravention of substantive and procedural due process rights; rights guaranteed to them by the Fifth Amendment of the United States Constitution and Article 1, Section 8 of the Nevada Constitution.

E.      The GOVERNMENT DEFENDANTS' egregious placement and maintenance of Plaintiff on the "Prohibited Persons List" for purchasing or otherwise acquiring a weapon governed by the Gun Control Act, 18 U.S.C. 922(g) based upon fabricated evidence and the GOVERNMENT DEFENDANTS' egregious branding and characterization of him as a "domestic terrorist" without notice or an opportunity to be heard also violates Plaintiff's substantive and procedural due process rights in violation of the Second Amendment to the United States Constitution and Article 1, Section 11 (Right to Keep & Bear Arms) of the Nevada Constitution.  Notably, the Prohibited Persons List only applies to persons:

- Convicted in any court of a crime punishable by imprisonment for a term exceeding one year;

- who is a fugitive from justice;

- who is an unlawful user of or addicted to any controlled substance (as defined in section 102 of the Controlled Substances Act, codified at 21 U.S.C. § 892);

- who has been adjudicated as a mental defective or has been committed to any mental institution;

- who is an illegal alien;

- who has been discharged from the Armed Forces under dishonorable conditions;

- who has renounced his or her United States citizenship;

- who is subject to a court order restraining the person from harassing, stalking, or threatening an intimate partner or child of the intimate partner; or

•       who has been convicted of a misdemeanor crime of domestic violence.
None of the aforementioned prohibitions, however, apply to Plaintiff and, as such, the
GOVERNMENT DEFENDANTS' placement and continued maintenance of Plaintiff Engel on
this Prohibited Persons List is, and remains, unconstitutional.

G.      The GOVERNMENT DEFENDANTS' unlawful arrest, detainment and
incarceration of Plaintiff also precluded him from freely practicing his faith and attending
weekly worship services / other church events in violation of the First and Eighth Amendments
to the United States Constitution, and Article 1, Section 4 (Liberty of Conscience) and Section 6
(Cruel & Unusual Punishment) of the Nevada Constitution.

## FIRST CLAIM FOR RELIEF
### (Deprivation of Civil Rights - 42 U.S.C. § 1983)

(All GOVERNMENT DEFENDANTS)

114.    Plaintiff fully incorporates herein by reference all allegations contained in
paragraphs 1 through 113 of this Complaint.

115.    Pursuant to 42 U.S.C. § 1983, persons who, acting under color of state law,
deprive another of rights guaranteed under the Constitution are accountable for same. *Gomez v.
Toledo*, 446 U.S. 635, 640 (1980).

116.    Although "Section 1983 does not create any substantive rights," it serves as "the
vehicle whereby plaintiffs can challenge actions by governmental officials." *Jones v. Williams*,
297 F.3d 930, 934 (9th Cir. 2002).

117.    To state a claim under 42 U.S.C. 1983, a plaintiff must allege two essential
elements:  (1) violation of a right secured by the Constitution or laws of the United States, and
(2) that the alleged deprivation was committed by a person acting under the color of state law.
*West v. Atkins*, 487 U.S. 42, 48 (1988).

118.    As set forth above, the GOVERNMENT DEFENDANTS, acting in their
individual capacities, deprived Plaintiff Engel of his First, Second, Fourth, Fifth and Eighth
Amendment rights arising under the United States Constitution; along with rights guaranteed to
him under Article 1, Sections 1 (Inalienable Rights), Section 4 (Liberty of Conscience), Section
6 (Excessive Bail & Fines), Section 8 (Rights of Accused in Criminal Prosecutions), 9 (Liberty

37

of Speech), 10 (Right to Assemble & Petition), Section 11 (Right to Keep & Bear Arms; Civil Power Supreme) and Section 18 (Unreasonable Seizure & Search; Issuance of Warrants) of the Nevada Constitution; and NRS 41.637 ("Good Faith Communications), NRS 244.364 (State Control Over Regulation of Firearms), NRS 199.310 (Malicious Prosecution) and NRS 200.460 (False Imprisonment).

119.    As set forth above, the GOVERNMENT DEFENDANTS' individualized conduct was intended to, and did in fact, deprive Plaintiff of his Federal and State Constitutional rights without substantive and procedural due process, and equal protection of law.

120.    As set forth above, all of the GOVERNMENT DEFENDANTS acted under color of law or lawful authority and power of the State of Nevada.

121.    Notably, the catalyst giving rise to the fabricated criminal charges advanced by the UNITED STATES against Plaintiff in the Underlying Action was the GOVERNMENT DEFENDANTS' implementation of the orders issued by the former Nevada Governor (Brian Sandoval), the Clark County Sheriff (Doug Gillespie) and Assistant Clark County Sheriff (Joe Lombardo) (i.e., to wind-down their operation and for a "Bundy" representative open the cattle pen and release the Bundy family's cows from the impound area).

122.    Defendants Bodgen and Love, recognizing that the GOVERNMENT DEFENDANTS' unlawful and unconstitutional conduct had failed to produce the planned result, implemented those orders (i.e., the State action) and, under color of Nevada law, directed federal and state officers to ensure that "a Bundy," if not Cliven Bundy himself, would pull the pins from the cattle pens so that the DOJ could use that affirmative act to establish the GOVERNMENT DEFENDANTS' fabricated theories of criminal conspiracy, extortion, armed robbery, among other false claims, against the Bundy defendants, including, without limitation, Plaintiff Engel.

123.    In accordance with the State orders and at the direction of the GOVERNMENT DEFENDANTS, Margaret Houston, a sister of Cliven Bundy, ultimately "pulled the pin" on the cattle pen and released the cattle.  Defendants Ahmed, Myhre and Bogden, in turn, used that . . .

1 physical act to support the GOVERNMENT DEFENDANTS' rogue prosecution of the Bundy

2 defendants, including, without limitation, Plaintiff Engel.

3     124.    As a direct, proximate and foreseeable cause of the GOVERNMENT

4 DEFENDANTS' egregious conduct, Plaintiff's Constitutional rights were deprived and, as a

5 result, Plaintiff Engel is entitled to monetary damages for his injuries, including, without

6 limitation: compensatory damages for the impairment of his reputation; personal humiliation;

7 mental anguish and suffering; mental and emotional distress; financial harm; and the loss of

8 gainful employment, including, without limitation, future impairment for Plaintiff's chosen

9 profession; attorneys' fees and costs.

### SECOND CLAIM FOR RELIEF
**Deprivation of Constitutional & Civil Rights and Conspiracy Claim**

(*Bivens* Claims - All GOVERNMENT DEFENDANTS
First, Fourth, Fifth & Eighth Amendment Violations)

13     125.    Plaintiff fully incorporates herein by reference all allegations contained in

14 paragraphs 1 through 124 of this Complaint.

15     126.    In *Bivens v. Six Unknown Named Agents of the Fed. Bureau of Narcotics*, 403

16 U.S. 388 (1971), the Supreme Court "recognized for the first time an implied private action for

17 damages against federal officers alleged to have violated a citizen's constitutional rights."

18 *Western Radio Services Co. v. U.S. Forrest Service*, 578 F.3d 1116, 1119 (9th Cir. 2009)

19 (*quoting Ashcroft v. Iqbal*, 556 U.S. 662, 673 (2009)).

20     127.    "Specifically, the Court in *Bivens* allowed a plaintiff to bring a damages action in

21 federal court against individual federal officials for violating the Fourth Amendment, despite the

22 absence of any federal statute authorizing such an action." *Id.* (*citing Bivens*, 403 U.S. at 397).

23     128.    Since that time, the Supreme Court has concluded that "an implied right of action

24 for money damages was consistent with congressional intent" for individual federal official's

25 violations of the Fifth and Eighth Amendments. *Id.*; *see also Davis v. Passman*, 442 U.S. 228

26 (1979) (Fifth Amendment); *Carlson v. Green*, 446 U.S. 14 (1980) (Eighth Amendment).

27     129.    In 2007, the Supreme Court provided further guidance and declared "a two-step

28 analysis for determining congressional intent as to the appropriateness of a *Bivens* remedy."

1   *Western Radio Services Co.*, 578 F.3d at 1119 (*quoting Wilkie v. Robbins*, 551 U.S. 537, 561-

2   562 (2007)).  Namely: (1) "whether there is 'any alternative, existing process for protecting' the

3   plaintiff's interests" and, "if the Court cannot infer that Congress intended a statutory remedial

4   scheme to take the place of a judge-made remedy," (2) "whether there nevertheless are 'factors

5   counseling hesitation' before devising such an implied right of action.'" *Id.* (*quoting Wilkie*, 551

6   U.S. at 550).

7         130.    Plaintiff Engel affirmatively alleges, therefore, that, for purposes of his First and

8   Fifth Amendment Claims, the ' individual-capacity conduct was purposefully directed with a

9   discriminatory purpose against him based upon his religious beliefs, and in express

10  contravention of his equal protection and freedom of expression rights. *Ashcroft v. Iqbal*, 556

11  U.S. 662, 676 (2009) (*citing Church of Lukumi Babalu Aye, Inc.v. Hialeah*, 508 U.S. 520, 540-

12  41 (1993)).  Notably, as memorialized in the Wooten Whistleblower Complaint, the

13  GOVERNMENT DEFENDANTS purposefully, intentionally and willfully engaged in their

14  calculated, egregious conduct because of [Plaintiff's] religious preference," including, without

15  limitation, Defendant Stover who exhibited extreme Anti-Mormon bias and religious hatred

16  against the Bundy family and their supporters and, in conjunction with the other

17  GOVERNMENT DEFENDANTS, conducted the Cattle Impoundment Operation in a manner

18  designed to humiliate, victimize and harm Plaintiff.

19        131.    As detailed above, the GOVERNMENT DEFENDANTS, in their individual

20  capacity, fabricated evidence, suborned and provided perjurious testimony, obtained false

21  indictments, unlawfully arrested, falsely imprisoned and held Plaintiff in-custody for fifty-four

22  (54) months and maliciously prosecuted him without probable cause or due process of law.

23        132.    Plaintiff affirmatively alleges that, where, as here, prosecutors and law

24  enforcement officers knowingly, intentionally and willfully engage in the fabrication or

25  falsification of evidence, subornation and providing of perjurious testimony, and engage in other

26  egregious acts during the "investigative function [ ] normally performed by a detective or police

27  officer," that conduct constitutes a violation of due process. *Lanuza v. Love*, 899 F.3d 1019,

28  1025-26 (9th Cir. 2018) (*citing Buckley v. Fitzsimmons*, 509 U.S. 259, 273 (1993)); *see also*

1  *Hartman v. Moore*, 547 U.S. 250, 260-61 (holding that a *Bivens* remedy may be available for

2  malicious prosecution); *Engel v. Buchan*, 710 F.3d 698, 708 (7th Cir. 2013) (extending *Bivens*

3  remedies in the *Brady* context).

4      133.    As detailed above, former Chief District Court Judge Navarro previously held,

5  among other things, that:

6          A.    "[***T]he government's conduct in [the Underlying Action] was indeed***

7                ***outrageous, amounting to a due process violation*** ....", and that a new
               trial is not an adequate sanction for this due process violation." Transcript
               at 21:08-11 (Emphasis Added); and

8

9          B.    "Even if the government's conduct did not rise to the level of a due
               process violation, the Court would nonetheless dismiss under its

10               supervisory powers because there has been flagrant misconduct,
               substantial prejudice, and no lesser remedy is sufficient ... Number one, to

11               properly remedy the constitutional violation; number two, to protect
               judicial integrity by ensuring that a conviction rests only on appropriate

12               considerations validly before a jury; and number three, to deter future
               illegal conduct." Transcript at 21:12-16, 21:20-24.

13      134.    Plaintiff further alleges that the GOVERNMENT DEFENDANTS, in their

14  individual capacity, entered into an express or implied agreement to deprive Plaintiff of his

15  Constitutional rights, memorialized, in part, in their Cattle Impoundment Operation plan and

16  aforementioned fabrication, destruction and concealment scheme. *Ting v. U.S.*, 927 F.2d 1504,

17  1512 (9th Cir. 1991) (setting forth necessary elements to establish a civil conspiracy claim under

18  *Bivens*); *see also Dooley v. Reiss*, 736 F.2d 1392, 1394-95 (9th Cir.), *cert. denied*, 469 U.S.

19  1038 (1984) (holding a conspiracy to deprive a plaintiff of a civil rights action by lying or

20  concealing evidence might constitute actionable deprivation under *Bivens*).

21      135.    Plaintiff alleges that as a direct, proximate and foreseeable cause of that rogue

22  agreement and civil conspiracy, Plaintiff's Constitutional rights were actually deprived in

23  contravention of the First, Fourth, Fifth and Eighth Amendment.

24      136.    As a direct, proximate and foreseeable cause of the GOVERNMENT

25  DEFENDANTS' egregious conduct, performed in their individual capacities, Plaintiff's First,

26  Fourth, Fifth and Eighth Amendment Constitutional rights, under *Bivens,* were deprived and,

27  therefore, Plaintiff is entitled to monetary damages for his injuries, including, without

28  limitation: compensatory damages for the impairment of his reputation; personal humiliation;

41

mental anguish and suffering; mental and emotional distress; financial harm; and the loss of gainful employment, including, without limitation, future impairment for Plaintiff's chosen profession; attorneys' fees and costs.

### THIRD CLAIM FOR RELIEF
**Declaratory Relief - 42 U.S.C. § 1988 & 28 U.S.C. § 2202**

(UNITED STATES)

137.    Plaintiff fully incorporates herein by reference all allegations contained in paragraphs 1 through 136 of this Complaint.

138.    Pursuant to 42 U.S.C. § 1988, district courts are vested with jurisdiction to protect the civil rights of all persons within the United States, and to vindicate same in conformity with the laws of the United States.

139.    Further, 28 U.S.C. § 2202 expressly enables this Court to enter further, necessary or proper relief based on a declaratory judgment or decree that might be granted, after reasonable notice and hearing, against any adverse party whose rights have been determined by such judgment.

140.    A justiciable controversy exists between the Plaintiff and the UNITED STATES regarding Plaintiff's egregious placement and continuing existence on the "Prohibited Persons List" for purchasing or otherwise acquiring a weapon governed by the Gun Control Act, 18 U.S.C. 922(g) (i.e., based upon fabricated evidence and the GOVERNMENT DEFENDANTS' egregious branding and characterization of Plaintiff as a "domestic terrorist"); for Defendant Willis's unlawful retention of Plaintiff's rifle and load-bearing vest which were egregiously confiscated by the UNITED STATES and the FBI following Plaintiff's unlawful arrest; and for other personal property wrongfully confiscated and/or stolen by a confidential informant and/or FBI agent (including Plaintiff's (a) 2007 Dodge Ram 3500 customized pick-up truck; (b) his Suzuki 750 ATV; (c) a Yamaha customized motorcycle; (d) a metal detector; (e) various rifles and firearms; (f) ammunition; (g) rifle scopes; (h) laser guides / sites; and (I) over $30,000 in silver coins).

141.    Plaintiff's and the UNITED STATES' respective interests are adverse to one another.

142.   Plaintiff has a legally protectable interest in the outcome of this Court's resolution of said dispute.

143.   The issue is ripe for adjudication.

144.   As a direct, proximate and foreseeable cause of the UNITED STATES wrongful placement of the Plaintiff's name on the Prohibited Persons List and its erroneous maintenance of same on that List, the UNITED STATES' unlawful retention of Plaintiff's rifle and load-bearing vest, and the UNITED STATES' unlawful retention of other personal property items (e.g., weapons, ammunition and gear), Plaintiff has been denied his rights under the Second Amendment of the United States Constitution, Article I, Section 11 of the Idaho Constitution (Right to Keep and Bear Arms), and for the State of Idaho's rights regarding same under IRS 18-3302J (which vests control over the regulation of, and policies concerning, firearms, firearm accessories and ammunition with the Idaho State Legislature, including, without limitation, the regulation of transfers, sales and purchases of same).

145.   As a result, Plaintiff seeks an Order from this Court: (a) restoring his rights to purchase, keep and bear arms; (b) directing the UNITED STATES to remove Plaintiff's name from the Prohibited Persons List; (c) directing the UNITED STATES to immediately return Plaintiff's rifle and load-bearing vest which, upon information and belief, remains in the custody, possession and control of Defendant Willis and the FBI; (d) directing the UNITED STATES' confidential informant and/or FBI agent to immediately return Plaintiff's personal property (including Plaintiff's (1) 2007 Dodge Ram 3500 customized pick-up truck; (2) his Suzuki 750 ATV; (3) a Yamaha customized motorcycle; (4) a metal detector; (5) various rifles and firearms; (6) ammunition; (7) rifle scopes; (8) laser guides / sites; and (9) over $30,000 in silver coins); and (e) awarding Plaintiff his costs, fees and expenses, including, without limitation, attorneys' fees and expert fees under 42 U.S.C § 1988.

**FOURTH CLAIM FOR RELIEF**
**(Federal Tort Claims Act Claims - 28 U.S.C. § 2671 *et seq.*)**

(UNITED STATES)

146.   Plaintiff fully incorporates herein by reference all allegations contained in paragraphs 1 through 145 of this Complaint.

147.    Pursuant to 28 U.S.C. § 1346(b), "federal district courts have jurisdiction over a certain category of claims for which the [UNITED STATES] has waived its sovereign immunity and 'render[ed]' itself liable," including, without limitation, "'claims that are:  [1] against the United States, [2] for money damages, ... [3] for injury or loss of property, or personal injury or death [4] caused by the negligent or wrongful act or omission of any employee of the Government [5] while acting within the scope of his office or employment, [6] under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.'" *F.D.I.C. v. Meyer*, 510 U.S. 471, 477 (1994) (quoting 28 U.S.C. § 1346(b)).

148.    "A claim comes within this jurisdictional grant – and thus is 'cognizable' under § 1346(b) – if it is actionable under § 1346(b).  And a claim is actionable under § 1346(b) if it alleges the six elements outlined above." *Id.* (*citing Loeffler v. Frank*, 486 U.S. 549 (1988)

149.    The Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2671 *et seq.,* is the exclusive remedy for tort actions against a Federal agency (28 U.S.C. § 2679(a)) and against Federal employees who commit torts while acting within the scope and course of their employment (28 U.S.C. § 2679(b)(1)).

150.    As set forth above, the GOVERNMENT DEFENDANTS engaged in certain tortious acts in their official capacities while other acts were performed in their individual capacities for which said Defendants are, and remain, personally liable.

151.    With regard to the GOVERNMENT DEFENDANTS' tortious conduct that was performed while they were "acting within the scope of [their official] office[s] or employment at the time of the incident out of which the [Plaintiff's] claim[s] arose," the UNITED STATES is solely liable for that conduct as mandated by 28 U.S.C. § 2679(d)(2)) and the Federal Employees Liability Reform & Tort Compensation Act of 1988 ("Westfall Act").

152.    Similarly, Plaintiff's exclusive remedy for his tort-based claims against the GOVERNMENT DEFENDANTS' employers (i.e., the DOJ, DOI, BLM and FBI) is the UNITED STATES (28 U.S.C. § 2679(a)).

. . .

153.    To that end, 28 U.S.C. § 2680(h) expressly provides that the UNITED STATES is also liable for certain intentional torts that are based on the "acts or omissions" of an "investigative or law enforcement officer" and include "[a]ny claim arising out of ... false imprisonment, false arrest, [and] malicious prosecution ...." *Millbrook v. U.S.*, 569 U.S. 50, 52 (2013) (*citing* 28 U.S.C. § 2680(h); *see also Levin v. United States*, 568 U.S. 503 (2013)).

154.    Here, Plaintiff has valid State-law tort claims arising out of, related to and connected with the GOVERNMENT DEFENDANTS' tortious conduct that was performed in their official capacity and during the scope and course of their employment with the DOJ, DOI / BLM and FBI, including, without limitation, the following claims:

A.    <u>False Arrest</u>

In Nevada, to establish false arrest, 'a plaintiff must show the defendant instigated or effected an unlawful arrest." *Jones v. Las Vegas Metropolitan Police Dept.*, 2011 WL 13305450 at *3 (D.Nev. 2011) (*quoting Nau v. Sellman*, 757 P.2d 358, 260 (Nev. 1988)). To that end, Plaintiff affirmatively alleges that the GOVERNMENT DEFENDANTS fabricated evidence, suborned and provided perjurious testimony, and egregiously withheld and destroyed exculpatory evidence so that they could erroneously secure Grand Jury Indictments upon which the false arrest warrant was issued against Plaintiff.  Plaintiff further alleges that, as a direct, proximate and foreseeable cause of the GOVERNMENT DEFENDANTS' tortious acts related to the instigation or effectuation of the unlawful arrest of Plaintiff (i.e., those acts performed in their official capacity, scope and employment with the DOJ, DOI/BLM and FBI), the UNITED STATES is, and remains, liable therefor.

B.    <u>False Imprisonment</u>

In Nevada, "[f]alse imprisonment is an unlawful violation of the personal liberty of another, and consists in confinement or detention without legal sufficient authority." NRS 200.460.  "To establish false imprisonment of which false arrest is an integral part, it is ... necessary to prove that the person be restrained of his liberty under probable imminence of force without any legal cause or justification." *Jones*, 2011 WL 13305450 at *3 (*quoting Hernandez v. City of Reno*, 634 P.2d 668, 671 (Nev. 1981).  "Thus, 'an actor is subject to liability to

1  another for false imprisonment 'if (a) he acts intending to confine the other ... within the

2  boundaries fixed by the actor, and (b) his act directly or indirectly results in a confinement of the

3  other, and (c) the other is conscious of the confinement or is harmed by it.'" *Id.* (*quoting*

4  Restatement (Second) of Torts § 35 (1965)).  Plaintiff, here, affirmatively alleges that he was

5  unlawfully detained, imprisoned and in-custody by the UNITED STATES for fifty-four (54)

6  months, at a sweltering federal-contractor prison in Pahrump, Nevada and at Lompoc

7  Penitentiary in Lompoc, California.  Plaintiff further alleges that, as a direct, proximate and

8  foreseeable cause of those tortious acts related to his unlawful incarceration (i.e., acts performed

9  by the GOVERNMENT DEFENDANTS in their official capacity, scope and employment with

10 the DOJ, DOI/BLM and FBI), those acts:  (a) were performed with the intention of confining the

11 Plaintiff to prison; (b) they directly or indirectly resulted in the Plaintiff's confinement; and

12 (c) Plaintiff was conscious of that unlawful confinement.  As a result, the UNITED STATES is,

13 and remains, liable therefor.

14            C.    Malicious Prosecution

15            In Nevada, "[a] person who maliciously and without probable cause

16 therefor, causes or attempts to cause another person to be arrested or proceeded against for any

17 crime of which that person is innocent" is liable for malicious prosecution. NRS 199.310.  In

18 this regard, to state a claim for malicious prosecution under Nevada law, a Plaintiff must allege:

19 "(1) that the defendant lacked probable cause to initiate a prosecution; (2) malice; (3) the prior

20 criminal proceedings were terminated in his favor; and (4) Plaintiff suffered damages."

21 *Anderson v. United States*, 2019 WL 6357256 at *2 (D.Nev. 2019) *(quoting LaMantia v. Redisi*,

22 118 Nev. 27, 30, 38 P.3d 877, 879 (Nev. 2002)*)*.  Plaintiff, here, affirmatively alleges that the

23 GOVERNMENT DEFENDANTS' fabrication of evidence, elicitation and providing of

24 perjurious testimony, along with the egregious withholding and destruction of exculpatory

25 evidence so that they could wrongfully secure a Grand Jury Indictment and arrest warrant

26 against Plaintiff establishes the absence of probable cause, along with the malicious intent of

27 said Defendants' conduct.  Plaintiff further alleges that the UNITED STATES' dismissal, with

28 prejudice, of all charges against him unequivocally establishes that the Underlying Action was

1    terminated in Plaintiff's favor.  Moreover, as detailed below, Plaintiff sustained damages as a

2    direct, proximate and foreseeable cause of the aforementioned tortious conduct.

3                    D.      Intentional Infliction of Emotional Distress

4                    In *Sheehan v. U.S.*, 896 F.2d 1168, 1172 (9th Cir. 1990), the Ninth

5    Circuit Court of Appeals expressly recognized the appropriateness of an intentional infliction of

6    emotional distress claim in FTCA actions.  To that end, in Nevada, "[t]he elements of a cause of

7    action for intentional infliction of emotional distress are '(1) extreme and outrageous conduct

8    with either the intention of, or reckless disregard for, causing emotional distress, (2) the

9    plaintiff's having suffered severe or extreme emotional distress and (3) actual or proximate

10   causation.'" *Dillard Dept. Stores, Inc. v. Beckwith*, 115 Nev. 372, 378, 989 P.2d 882, 886 (Nev.

11   1999).  Plaintiff here affirmatively alleges that the GOVERNMENT DEFENDANTS' conduct

12   (i.e., for those acts performed in their official capacity, scope and employment with the DOJ,

13   DOI/BLM and FBI) was: (1) extreme and outrageous and accomplished with the intent, or

14   reckless disregard for, causing Plaintiff emotional distress; (2) the Plaintiff, in fact, has suffered,

15   and continues to suffer from, severe and extreme emotional distress; which (3) was actually or

16   proximately caused.  As a result, the UNITED STATES is, and remains, liable for Plaintiff's

17   damages (discussed below).

18                    E.      Theft / Conversion

19                    Conversion is "a distinct act of dominion wrongfully exerted over

20   another's personal property in denial of, or inconsistent with his title or rights therein or in

21   derogation, exclusion or defiance of such title or rights." *Wantz v. Redfield*, 74 Nev. 196, 198,

22   326 P.2d 413, 414 (1958).  Conversion is an act of general intent, which does not require

23   wrongful intent and is not excused by care, good faith, or lack of knowledge. *Evans v . Dean*

24   *Witter Reynolds, Inc.*, 116 Nev. 598, 606, 5 P.3d 1043, 1048 (2000).  Upon information and

25   belief, an FBI confidential informant and/or federal agent befriended Mr. Engel during the two

26   years after the Toquop Wash incident and prior to his arrest.  Following Mr. Engel's arrest, the

27   confidential informant / federal agent entered onto Mr. Engel's property (without permission)

28   and removed various items of Mr. Engel's personal property with the government's knowledge

and/or consent, including, without limitation: (1) his 2007 Dodge Ram 3500 customized pick-up truck; (2) his Suzuki 750 ATV;  (3) a Yamaha customized motorcycle; (4) a metal detector; (5) various rifles and firearms; (6) ammunition; (7) rifle scopes; (8) laser guides / sites; and (9) over $30,000 in silver coins. In aggregate, Mr. Engel has sustained $200,000 in property damages related to the theft of his property.

155.    Pursuant to 28 U.S.C. § 1346(b), Plaintiff has timely and properly submitted a Claim for Damage, Injury or Death to the UNITED STATES and its requisite agencies and, as such, has fully satisfied his obligation to present his FTCA claims to the Court.

**WHEREFORE**, Plaintiff is entitled to judgment against the Defendants, and each of them, for the following relief:

A.    Monetary damages in an amount to be proven at trial;

B.    Attorneys' fees and costs as to Counts One through Three;

C.    Pre-judgment and post-judgment interest pursuant to law;

D.    For hedonic damages in favor of the Plaintiff for the impairment of his future employment opportunities;

E.    Compensatory damages arising out of, related to or connected with the reputational harm of being branded a "domestic terrorist;"

F.    Declaratory relief as to the GOVERNMENT DEFENDANTS' wrongful placement of Plaintiff on the "Prohibited Persons List" for purchasing, keeping and bearing firearms, and the return of his rifle and load-bearing vest; and other personal property;

G.    All such other and further relief as the Court may deem just and equitable, including, without limitation, post-judgment attorneys' fees and costs.

RESPECTFULLY SUBMITTED this 7th day of September, 2021.

◆

Marquiz Law Office
Professional Corporation

◆

By: /s/ Craig A. Marquiz, Esq.
Craig A. Marquiz, Esq.
3088 Via Flaminia Court
Henderson, NV 89052
Counsel for Plaintiff